**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **CAROLYN S. DENNIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 1:11 CV 58** |
| | ) | |
| **JOHN E. POTTER,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Defendants the United States Postal Service and United States Postmaster

General Megan Brennan[1] have moved for summary judgment on plaintiff Carolyn

Dennis's claims. (DE # 44.) Plaintiff has filed a response (DE # 46), and defendants have

filed a reply (DE # 49). For the following reasons, defendants' motion for summary

judgment is granted in part and denied in part.

## I.     Facts and Background

Plaintiff has submitted "a section labeled 'Statement of Genuine Disputes' that

identifies the material facts that the party contends are genuinely disputed so as to

make a trial necessary[,]" as required by N.D. IND. LOCAL RULE 56-1(b)(2). (DE # 48.)

This document, however, contains no citations to the record to support its various

factual assertions. The court, therefore, will disregard it. Fed. R. Civ. Pro. 56(c)(1), (e).

---

[1] Plaintiff originally sued a different Postmaster General. Postmaster General
Brennan took office in 2015. *See* Fed. R. Civ. Pro. 25(d).

Plaintiff has, however, also included a "Statement of Material facts" (DE # 47 at 2) which does contain citations to the record. This section of plaintiff's brief is not without faults, unfortunately. It is rife with grammatical and spelling errors. Additionally, plaintiff made the bizarre choice of copying and pasting large portions of defendants' statement of material facts, verbatim, despite the fact that plaintiff goes on to offer facts which directly conflict with those facts she has already copied from defendants' statement of material facts.

For example, in one paragraph, plaintiff states: "Neither Carolyn Dennis nor Terry Walker had any authority to either view of [sic] manage Karen Gillig's clock rings."(DE # 47 at 3.) In the very next paragraph, plaintiff states: "Carolyn Dennis has the authority to view clock rings of Karen Gillig . . . ." (*Id.*) This makes it extremely difficult to tell which facts asserted in defendants' motion are actually disputed by plaintiff.[2] Despite the numerous inadequacies in plaintiff's response, the court will do

_____

[2] This bizarre form of writing continues into plaintiff's analysis section, where she copies and pastes portions of defendants' brief while making minor changes. This is apparently not the first time that plaintiff and her lawyer have used this writing tactic. Judge Springmann, in another case filed by this plaintiff and her attorney, noted:

> Apparently, counsel for the Plaintiff cut and pasted substantial portions of the Defendants' Memorandum of Law and made slight alterations here and there to make opposing arguments, but without carefully reviewing and proofreading the resulting statements. At points, this conduct by counsel for the Plaintiff becomes more apparent because he failed to make alterations in some sections of his Memorandum of Law such that he actually makes the Defendants' arguments for them.

*Dennis v. Potter*, No. 1:08 CV 198 TLS, 2010 WL 987217, at *2 (N.D. Ind. Mar. 15, 2010).

its best to accurately summarize the facts and arguments that the parties have set out in their briefs.

At all times relevant to the facts of this case, plaintiff was employed by the United States Post Office Fort Wayne branch as a customer service supervisor. (DE # 45 at 2; DE # 47-6 at 1.) Plaintiff's immediate supervisor was the Manager of Customer Service, Karen Gillig. (DE # 45 at 2; DE # 47-6 at 1.) Gillig, in turn, reported to the Postmaster of the Fort Wayne Post Office, Dawn Gerardot. (DE # 45 at 2; DE # 47-1 at 6.)

As part of her duties, plaintiff managed approximately fourteen clerks in the retail section of the Post Office. (DE # 47-1 at 6-7.) Additionally, plaintiff performed Post Office closing duties at the end of the day. (DE # 45 at 2; DE # 45-3 at 2.) In July of 2009, plaintiff filed an Equal Employment Opportunity ("EEO") action against her supervisor, Karen Gillig. (DE # 45 at 3; DE # 32 at 2.) At some point in 2009, one of the employees working under plaintiff filed an EEO action against plaintiff, and that action was ultimately dismissed. (DE # 45 at 3; DE # 45-1 at 2-3.)

In her complaint, plaintiff alleges that as a result of her previous EEO charge against Gillig, plaintiff was retaliated against by Gillig and others at the Post Office. (DE # 32 at 2.) Plaintiff alleges that she suffered from several different adverse employment actions in retaliation for her EEO activity, and also alleges that she was subjected to a hostile work environment as retaliation for her EEO activity. (*Id.* at 2-4.)

---

The court will summarize the facts of each alleged adverse employment action individually.

**A. Investigative Interview**

On November 20, 2009 plaintiff was given an investigative interview after plaintiff viewed Gillig's clock rings[3] and was accused of violating Gillig's privacy. (DE # 45-1 at 20; Dennis Dep. 60:1-12; DE # 45-1 at 22; Dennis Dep. 62:1-11.) This investigative interview came about after plaintiff and another employee, Terry Walker, accessed Gillig's clock rings on a computer. (DE # 45-1 at 22-23; Dennis Dep. 62:1-63:8.) Although plaintiff had no authority to adjust Gillig's clock rings (DE # 45-1 at 22-23; Dennis Dep. 62:22-63:3), she did have the authority to view Gillig's clock rings. (DE # 47-6 at 1; Dennis Aff. ¶ 3.)

When Fort Wayne Postmaster Gerardot found out about this activity, she believed that it violated Gillig's privacy, and she therefore forwarded the matter to the Manager of Post Office Operations for further investigation. (DE # 45-4 at 4-5; Gerardot Aff. ¶ 6.) After an investigation, plaintiff was given an "investigative interview" at which her counsel was allowed to attend. (DE # 47-6 at 1; Dennis Aff. ¶ 4.) Plaintiff was also threatened with termination. (DE # 47-6 at 1-2; Dennis Aff. ¶ 4.) Walker, who had instructed plaintiff to look at the clock rings, was only given an "interview." (DE # 47-6 at 1-2; Dennis Aff. ¶ 4.) As a result of her investigative interview, plaintiff was subjected

_____

[3] A clock ring is apparently the device that postal employees use to clock in and out of work.

to stress and humiliation. (DE # 47-6 at 1-2; Dennis Aff. ¶ 4.) No discipline or any other action was taken against either plaintiff or Walker as a result of their conduct. (DE # 45-4 at 4-5; Gerardot Aff. ¶ 6.)

**B. Delay In Making Pay Adjustments**

Plaintiff also encountered issues with getting the full amount of her pay in her regularly-scheduled paycheck. (DE # 45 at 4.) On May 21, 2009, plaintiff worked 5.6 hours, which, under the payroll system, meant that she should have been paid for a full eight hours. (DE # 47-6 at 3; Dennis Aff. ¶ 6.) Plaintiff, however, was only paid for the 5.6 hours she actually worked, and was not paid for the additional 2.4 hours to which she was entitled. (*See* DE # 47-6 at 3; Dennis Aff. ¶ 6.)

On August 14, 2009, plaintiff sent Gillig an email informing her about the pay situation and asking Gillig to fix it. (DE # 45-2 at 15.) On that same day, Gillig made a pay adjustment so that plaintiff would be paid for the 2.4 hours she was not paid for on May 21, 2009. (DE # 45-1 at 47-48; Dennis Dep. 95:18-96:7.) In the email, plaintiff accused Gillig of purposely withholding the pay adjustment because of plaintiff's prior EEO activity. (DE # 45-2 at 15.)

On July 15, 2009 plaintiff was on approved annual leave for the day, but Gillig required plaintiff to report to work to upgrade a computer system. (DE # 47-6 at 3; Dennis Aff. ¶ 9.) Plaintiff was charged for the eight hours of annual leave for that day, but was not paid for the three hours that she actually worked. (DE # 47-6 at 3; Dennis Aff. ¶¶ 9-10.) In the August 14, 2009 email that plaintiff sent to Gillig, plaintiff also told

Gillig about the mistake in her pay from July 15, 2009. (DE # 45-2 at 15.) That same day, Gillig made the required pay adjustment so plaintiff would get paid for the three hours she worked. (DE # 45-1 at 48; Dennis Dep. 96:8-25.)

On September 9, 2009, plaintiff was on approved annual leave, but Gillig ordered plaintiff to come in to fill out an EEOC affidavit. (DE # 47-6 at 3-4; Dennis Aff. ¶ 10.) Plaintiff was not paid for the approximately six hours she worked that day. (DE # 47-6 at 3-4; Dennis Aff. ¶ 10.) Gillig made an adjustment to pay plaintiff for the hours she worked on September 9, 2009 on February 17, 2010. (DE # 45-1 at 50-51; Dennis Dep. 100:1-101:19.) Plaintiff was not aware of any other employee being required to come into work on a day that they were on pre-approved leave to fill out an EEOC affidavit. (DE # 47-6 at 3-4; Dennis Aff. ¶ 10.) Plaintiff was also not aware of any other management employee that was supervised by Gillig who also had pay adjustments made a significant time after the originating pay period. (DE # 47-6 at 4; Dennis Aff. ¶ 11.)

Plaintiff was also not given credit for .46 hours on February 11, 2010. (DE # 45-1 at 52; Dennis Dep. 102:8-23.) This occurred after fellow supervisor Tom Green adjusted her hours to reflect .46 hours of leave without pay. (DE # 45-1 at 53; Dennis Dep. 103:3-11.) Plaintiff brought the issue to Gillig's attention on March 17, 2010 (DE # 45-1 at 55-56; Dennis Dep. 105:18-106:6; DE # 45-2 at 22), and Gillig adjusted plaintiff's pay on March 24, 2010. (DE # 45-1 at 57-58; Dennis Dep. 107:21-108:8.)

The Post Office did have a program which provided for immediate advancements to employees that had not been paid properly. (DE # 45-3 at 5; Gillig Aff. ¶ 7.) Plaintiff, however, did not qualify for an immediate advancement. (DE # 47-6 at 4; Dennis Aff. ¶ 13.)

### C. Delay in Approving Leave Slips

On January 20, 2010 plaintiff submitted a leave slip to Gillig requesting time off on March 2, 2010. (DE # 45-3 at 5; Gillig Aff. ¶ 10.) The leave slip was approved on January 22, 2010, but was not given to plaintiff until March 1, 2010. (DE # 45-3 at 5-6; Gillig Aff. ¶ 10.; DE # 45-3 at 26.) Plaintiff did not request that the leave be under the Family and Medical Leave Act ("FMLA"), and Gillig approved the leave slip as "not FMLA" leave.[4] (DE # 45-3 at 5-6; Gillig Aff. ¶ 10.; DE # 45-3 at 26.)

On February 4, 2010 plaintiff submitted a leave slip to Gillig requesting time off on March 9, 2010. (DE # 45-1 at 60; Dennis Dep. 110:3-10.) Gillig approved the leave on March 8, 2010 and plaintiff did not miss her doctor's appointment. (DE # 45-2 at 26; DE # 45-1 at 60; Dennis Dep. 110:3-17.) Plaintiff did not request that the leave be under the FMLA, and Gillig approved the leave slip as "not FMLA" leave. (DE # 45-3 at 27.)

On February 24, 2010 plaintiff submitted three leave slips to Gillig requesting time off on March 22, 2010, March 23, 2010, and March 24, 2010. (DE # 45-2 at 26; DE # 45-1 at 61-63; Dennis Dep. 111:8-163:19.) On March 12, 2010, plaintiff emailed

---

[4] Plaintiff has failed to direct the court to evidence that she missed her March 2, 2010 appointment.

Gillig because Gillig had not yet approved those leave slips. (DE # 45-2 at 32.) After receiving the email, Gillig approved these leave slips on March 12. (DE # 45-2 at 26; DE # 45-1 at 61-63; Dennis Dep. 111:8-163:19.) Plaintiff did not mark any of these leave slips as requesting Family and Medical Leave Act ("FMLA"), and Gillig approved these slips as "not FMLA" leave. (DE # 45-3 at 28-30.) Plaintiff did not miss any of these appointments. DE # 45-1 at 64-65; Dennis Dep. 114:25-115:2.)

### D. Request for Updated Doctor's Information

In January 2008, plaintiff was given a medical restriction that limited her to working eight hours a day. (DE # 45-1 at 13; Dennis Dep. 50:5-7; DE # 45-3 at 7.) The United States Postal Service requires that employees who have medical restrictions periodically update those restrictions. (DE # 45-3 at 7; Gillig Aff. ¶ 15.) As of March 2010, the most recent medical restriction update that Gillig had received from plaintiff was from March 2009. (DE # 45-3 at 7; Gillig Aff. ¶ 15.)

On March 2, 2010 plaintiff went to her doctor to get a periodic checkup. (DE # 45-1 at 8; Dennis Dep. 45:10-11.) Plaintiff had turned in her leave slip for her March 2 appointment on January 20, 2010. (DE # 45-1 at 8; Dennis Dep. 45:10-11.) Plaintiff, however, was not given her signed leave slip until the day before her appointment. (DE # 45-3 at 5-6; Gillig Aff. ¶ 10.; DE # 45-3 at 26.) After plaintiff returned from her appointment on March 2, Gillig asked plaintiff to provide an update on her medical restrictions. (DE # 45-1 at 8; Dennis Dep. 45:15-17.)

Plaintiff was upset that Gillig did not ask for the updated medical restriction information until plaintiff got back from her appointment. (DE # 45-1 at 11; Dennis Dep. 48:9-20.) In order to get the required medical restriction information, plaintiff had to call her doctor's office and ask them to send her the updated information. (DE # 45-1 at 28; Dennis Dep. 72:5-11.)[5]

**E. 2009 Performance Rating**

In 2009, Gillig was the supervisor that was tasked with rating plaintiff's performance. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) Gillig evaluated plaintiff as an "Exceptional Contributor[,]" the highest rating possible. (DE # 45-3 at 5; Gillig Aff. ¶ 7; DE # 47-1 at 68; Dennis Dep. 118:15-22.) Plaintiff agreed that she should be rated as an Exceptional Contributor. (DE # 47-1 at 68; Dennis Dep. 118:23-24.)

The District Manager had to give final approval to the ratings given to managers and supervisors. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) Plaintiff's rating, along with the ratings of several other managers and supervisors, were sent to the District Manager for approval. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) Employees were graded on several criteria that were made up of set goals the employee had to meet. (DE # 45-3 at 8-9; Gillig Aff.

---

[5] In her brief, plaintiff also claims that no other employees that worked at the Post Officer were required to provide medical restriction updates, and also that Gillig has not requested a medical restriction update from plaintiff since the March 2010 update. (DE # 47 at 10-11.) Plaintiff fails to cite evidentiary support for the assertion that Gillig has not requested any updates medical information from plaintiff since March 2010. And, although plaintiff does cite her own affidavit in support of the assertion that no other employees were required to give updated medical information, nothing in the paragraph that plaintiff cites for this proposition supports the assertion plaintiff is making. The court will therefore disregard these facts.

¶ 18.) These goals were then compared to the National Performance Assessment rating. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) If an employee's rating exceeded or was lower than the National Performance Assessment by 5%, then a district manager had the discretion to increase or reduce the employee's rating. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.)

As a result of the economic downturn in 2009, many managers and supervisors, including Gillig, had their ratings reduced to a rating of "Contributor." (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) Plaintiff's rating was also reduced to Contributor by the District Manager. (DE # 45-3 at 8-9; Gillig Aff. ¶ 18.) Plaintiff appealed her rating, but her appeal was not successful. (DE # 47 at 12.)[6]

### F. Phone Calls While Home Sick

Plaintiff's duties included accounting for and auditing the Fort Wayne Post Office's stock of money orders and stamps. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) On March 30, 2010 plaintiff was unexpectedly not at work because she was sick. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) On that day, the clerks at the Fort Wayne Post were short on money orders and stamps to sell to customers. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) Due to this problem, Gillig called plaintiff at home in order to find out the best way to deal with the money order issue, and also to find out the location of the set of keys that opened the

---

[6] In her brief, plaintiff asserts that "[t]he denial of plaintiff's performance rating has continuing ramifications and impact on her retirement and pay." (DE # 47 at 12.) Plaintiff, however, cites no portion of the record to support this assertion, and the court will disregard it.

locked cabinet that contained the money orders. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) Plaintiff told Gillig that the keys were in the safe. (DE # 45-3 at 6; Gillig Aff. ¶ 14.)

Gillig, however, was unable to find the keys to the safe and had to call plaintiff back a second time. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) Despite the second call, Gillig was still unable to find the keys to the safe and had to saw off the lock to the safe. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) Later in the day, Gillig called plaintiff again because the retail postage supply for the clerks was low. (DE # 45-3 at 6; Gillig Aff. ¶ 14.) During this call, Gillig asked plaintiff how to account for and resupply the clerks with stamps. (DE # 45-3 at 6; Gillig Aff. ¶ 14.)

At that point, plaintiff became upset and told Gillig that she needed to do whatever she thought was best. (DE # 45-3 at 6-7; Gillig Aff. ¶ 14.) Gillig responded that she did not want to violate procedure by inadvertently accounting for the money orders and stamps. (DE # 45-3 at 7; Gillig Aff. ¶ 14.) Plaintiff then got upset again, and accused Gillig of harassing her. (DE # 45-3 at 7; Gillig Aff. ¶ 14.) The call ended, and Gillig did not call plaintiff again. (DE # 45-3 at 7; Gillig Aff. ¶ 14.)

Plaintiff believes that Gillig, who has been her supervisor for years, knew or should have known how to do the things Gillig called plaintiff about on March 30, 2010. (DE # 47-6 at 5; Dennis Aff. ¶ 16.) Therefore, plaintiff believes that there was no reason for Gillig to call her three times that day, and that the only reason Gillig did call plaintiff was to harass her.

### G. Plaintiff's Medical Restrictions

Part of plaintiff's duties included checking in postal carriers at the end of the day, and occasionally the postal carriers would not finish their deliveries until after plaintiff's eight hours of duty were over. (DE # 45 at 10; DE # 47 at 14.) To ensure that plaintiff did not exceed her eight-hour daily restriction, Gillig arranged for another employee to handle closing duties or changed plaintiff's schedule by an hour so that she would be within her time restriction. (DE # 45-3 at 7; Gillig Aff. ¶ 16.) Gillig told plaintiff that she was only supposed to work within her restrictions. (DE # 45-3 at 7; Gillig Aff. ¶ 16; DE # 45-1 at 86; Dennis Dep. 137:12-21; DE # 45-2 at 34.) Neither Gerardot nor Gillig ever told plaintiff that she needed to work beyond her eight-hour restriction or that she would suffer any consequences if she did not get all of her tasks done. (DE # 45-3 at 7; Gillig Aff. ¶ 16; DE # 45-4 at 2-3; Gerardot Aff. ¶ 2; DE # 45-1 at 88-89; Dennis Dep. 139:23-140:6.) Any time that plaintiff ever worked beyond her restriction, it was by her own choice, and not from any threat of an adverse consequence. (DE # 45-3 at 7; Gillig Aff. ¶ 16; DE # 45-4 at 3; Gerardot Aff. ¶ 2.)

### H. Alleged threats of change of job duties and shift change

In June 2010, after additional duties were given to Post Office Supervisors, Gillig changed plaintiff's work hours from 9:30 AM-6:30 PM to 10:00 AM-7:00 PM in order for plaintiff to be better able to comply with these newly-added duties. (DE # 45-3 at 8; Gillig Aff. ¶ 17.) Plaintiff did not want to have her hours changed, so Gillig and Gerardot discussed an alternative option for modifying plaintiff's schedule, but plaintiff

did not like that option either. (DE # 45-4 at 3; Gerardot Aff. ¶ 3.) At that point,

Gerardot informed plaintiff that her hours were going to be changed according to

Gillig's original suggestion: from 9:30 AM-6:30 PM to 10:00 AM-7:00 PM. (DE # 45-4 at

3; Gerardot Aff. ¶ 3; DE # 45-3 at 8; Gillig Aff. ¶ 17.)

## II.     Procedural History

As a result of the above incidents, plaintiff filed suit against defendants (DE # 32)

alleging retaliation under Title VII and violations of the FMLA. (DE # 47 at 1.)

Defendants have now moved for summary judgment on both of plaintiff's claims.

(DE # 44.)

## III.    Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment,

after adequate time for discovery, against a party "who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S.

317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there

are no disputed issues of material fact and the movant must prevail as a matter of law.

In other words, the record must reveal that no reasonable jury could find for the non-

moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir.

1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these

requirements have been met; it may discharge this responsibility by showing that there

is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

**IV. Analysis**

**A. Retaliation**

Title VII's anti-retaliation provisions make it unlawful "for an employer to discriminate against any . . . employee[ ]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter," or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Colloquially, the first provision is known as the "opposition clause," and the second as the "participation clause." *Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 274 (2009).

In a case alleging unlawful retaliation under Title VII, a plaintiff may survive summary judgment by using either the "direct" or "indirect" method of proof to establish that a trial of her claim(s) is necessary. *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006). Under the direct method, a plaintiff must point to evidence showing that she: 1) engaged in a statutorily-protected activity; 2) suffered an adverse employment action; and 3) a causal connection exists between the two events. *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (stating elements in context of ADEA claim).

"Under the indirect method, [plaintiff] must demonstrate that [s]he: (1) engaged in statutorily protected activity; (2) met [defendant]'s legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity." *Mintz v.*

*Caterpillar Inc.*, No. 14 1881, --- F.3d ----, 2015 WL 3529396, at *6 (7th Cir. June 5, 2015) (citations and quotations omitted). Under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the term "adverse employment action" is more broadly defined in a retaliation action than in a disparate treatment action. The Supreme Court reasoned that while the terms "hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee" are in Title VII's anti-discrimination provision, the anti-retaliation provision has no such limiting words. *Id.* at 62–63. The Court surmised that the anti-discrimination provision promotes a workplace where individuals are not discriminated against because of their status, while the goal of the anti-retaliation provision is to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees. *Id.*

Accordingly, the Court held that, in the context of a Title VII retaliation claim, an employee need not show that the action affected the terms and conditions of employment, but rather she must simply show that a reasonable employee would have found the employer's challenged action "materially adverse . . . which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106-07 (7th Cir. 2012) ("[I]t is important to separate significant from trivial harms; an action is only adverse if it might dissuade a

reasonable worker from making or supporting a charge of discrimination." (citations and quotations omitted)).

Defendants argue that plaintiff's retaliation claim fails because she has not provided any evidence that she suffered an adverse employment action. (DE # 45 at 15); *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) ("The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim, regardless of whether the claim is reviewed under the traditional direct/indirect framework or the less rigid framework our cases have recently suggested."). The court will address each of plaintiff's alleged adverse employment actions in turn.

### i. Investigative Interview

Plaintiff first asserts that she suffered an adverse employment action when she was investigated regarding her viewing of Gillig's clock rings. (DE # 47 at 17.) Plaintiff contends that this interview was stressful, embarrassing, and that she was threatened with termination during the interview. (*Id.*)

No reasonable jury could conclude that being given an investigative interview in the circumstances that plaintiff was would prevent a reasonable person in plaintiff's position from making or supporting a charge of discrimination. While the stress and embarrassment of the investigative interview were undoubtedly unpleasant for plaintiff, the court must "separate significant from trivial harms[,]" *White*, 548 U.S. at 68, and these allegations fall into the latter category. *See Dennis v. Potter*, No.

1:08 CV 198 TLS, 2012 WL 8251513, at *18 (N.D. Ind. Mar. 23, 2012). Additionally, the fact that plaintiff was threatened with termination during the interview does not change that result, considering that no disciplinary action was actually taken against plaintiff. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse."); *see also Poullard v. Shinseki*, No. 12 C 7497, 2015 WL 1428105, at *10 (N.D. Ill. Mar. 26, 2015) (applying *Ajayi* to retaliation claim), *appeal docketed*, No. 15-1962, May 4, 2015.

### ii. Delay in Making Pay Adjustments

Next, plaintiff argues that she suffered an adverse employment action when the pay adjustments necessary to compensate her for the actual amount of time that she worked were not made in a timely manner. (DE # 47 at 17.) In response, defendants argue that the delays in plaintiff's pay adjustments were not an adverse employment action because plaintiff could not actually point to any harm suffered due to these delays. (DE # 49 at 5-6.)

As the court noted earlier, plaintiff complained about four pay adjustments over a six-month period. (*See supra* pp. 5-6.) Despite plaintiff's contention in her brief that she could "articulate the harm she suffered from the delayed arrival of her pay[]" (DE # 47 at 17), plaintiff does not actually indicate to the court what that harm was, other than the fact that she received her pay later than she should have. (*Id.* at 17-18.) Although this was surely inconvenient for plaintiff, she has not directed the court to any concrete harm that she suffered as a result in these pay delays. Therefore, no

reasonable jury could conclude that a reasonable person in plaintiff's shoes would be prevented from making or supporting a charge of discrimination due to a delay of a few hours of pay on four occasions. *See Dennis*, 2012 WL 8251513, at *16.

### iii. Delays In Leave Approval

Plaintiff also argues that Gillig's delays in approving her leave slips amounted to an adverse employment action. (DE # 47 at 18.) In response, defendants argue that there was no adverse employment action because all of the leave slips plaintiff complained about were approved in time such that plaintiff missed no appointments. (DE # 49 a 8-9.)

Plaintiff does not dispute that the delays in getting her leave slips approved did not result in her missing any of her appointments. (DE # 47 at 18.) Thus, plaintiff only contends that the delays were "inconvenient and annoying" to her. (*Id.*) This is insufficient for a reasonable jury to conclude that a reasonable person in plaintiff's position would be prevented from making or supporting a charge of discrimination. *Brown*, 700 F.3d at 1106-07 ("Because an adverse employment action under Title VII's retaliation provision must be 'materially' adverse, it is important to separate significant from trivial harms; an action is only adverse if it might dissuade a reasonable worker from making or supporting a charge of discrimination." (citations and quotations omitted)); *Cromwell v. Washington Metro. Area Transit Auth.*, No. CIV.A.97 2257 PLF, 2006 WL 2568009, at *6 (D.D.C. Sept. 5, 2006).

### iv. Updated Medical Restrictions

Next, plaintiff contends that she suffered an adverse employment action when Gillig asked plaintiff for her updated medical restrictions after plaintiff went to see her doctor. (DE # 47 at 10-11.) Plaintiff was upset with Gillig's request because Gillig did not ask her for the update before she went to the doctor. (*Id.*) As defendants point out (DE # 45 at 18), however, the only result of Gillig asking for the updated restrictions after plaintiff's appointment was that plaintiff had to call her doctor one time. (DE # 45-1 at 28; Dennis Dep. 72:5-11.) This is insufficient for a reasonable jury to conclude that a reasonable person in plaintiff's position would be prevented from making or supporting a charge of discrimination. *Brown*, 700 F.3d at 1106-07 ("Because an adverse employment action under Title VII's retaliation provision must be 'materially' adverse, it is important to separate significant from trivial harms; an action is only adverse if it might dissuade a reasonable worker from making or supporting a charge of discrimination." (citations and quotations omitted)).

### v. 2009 Performance Rating

Plaintiff also argues that the reduction of her 2009 performance rating from "Exceptional Contributor" to "Contributor" by the district manager was an adverse employment action. (DE # 47 at 18-19.) In response, defendants argue that plaintiff cannot show that she suffered any harm from the reduction in her performance rating. (DE # 45 at 18-19.)

At two points in her response brief, plaintiff asserts that the negative performance rating has impacted her retirement and pay. (DE # 47 at 12, 18-19.) Plaintiff, however, does not cite the record for either of those assertions.[7] The court will therefore disregard this assertion. *Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) ("[I]t is universally known that statements of attorneys are not evidence."); *see also U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 805 (N.D. Ill. 2011) (The court "is not required to scour the record for evidence that supports a party's case if the party fails to point it out; that is the counsel's job.").

Given that plaintiff has not shown that she was impacted in any way from the reduced performance rating, no reasonable jury could conclude that a reasonable person in plaintiff's position would be prevented from making or supporting a charge of discrimination because of this reduction. *Chaib*, 744 F.3d at 987 ("Even under the

---

[7] On page 12 of plaintiff's brief (DE # 47 at 12), plaintiff does cite the record directly before and after the assertion, but neither of the documents to which plaintiff cites supports the proposition that the negative performance review impacted her pay or retirement. Additionally, the court cannot be sure that plaintiff is referring to these documents. She cites to Exhibit A and Exhibit B, without any additional detail. The exhibits she submitted, however, are numbered, and not lettered, until she gets to her own affidavit, which has lettered exhibits. Because Gillig, Gerardot, and plaintiff's affidavits contain lettered exhibits, the court can only assume that plaintiff is referring to those lettered exhibits. But nothing in any of those exhibits supports plaintiff's assertion here. (DE # 47-7 at 1-2; DE # 47-8 at 1; DE # 47-9 at 1; DE # 47-3 at 11-16, 17, 22; DE # 47-4 at 6, 7.)

more generous standard that governs retaliation claims, a reprimand without more is not an adverse employment action." (citations and quotations omitted)).[8]

### vi. Calls While Home Sick

Next, plaintiff argues that suffered an adverse employment action when Gillig called her three times in one day while plaintiff was home sick. (DE # 47 at 12-13.) All three of the calls were work related, but plaintiff contends that the issues could have been resolved without the phone calls. (*Id.*) In response, defendants argue that three work-related phone calls in one day would not dissuade a reasonable person from pursuing a discrimination claim. (DE # 49 at 10.)

The court agrees with defendants. No reasonable jury could conclude that a reasonable person in plaintiff's position would be dissuaded from pursuing a discrimination claim because of these three phone calls. *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("Title VII . . . does not protect an employee from trivial harms, petty slights, nor minor annoyances . . . .").

### vii. Plaintiff's Medical Restrictions

As noted earlier, plaintiff was only supposed to work eight hours a day pursuant to a medical restriction issued by her doctor. Plaintiff contends that she suffered an

---

[8] Even if plaintiff had shown some harm, she would still not be able to show that she was treated less favorably than similarly situated employees who did not engage in protected activity. Not one manager or supervisor working under Gerardot, the Post Master of the Fort Wayne Post Office, received a rating above "contributor." (DE # 45-4 at 3-4; Gerardot Aff. ¶¶ 4-5.)

adverse employment action when she was forced to work beyond those restrictions by

Gillig and Gerardot:

> Plaintiff has never wanted to work outside her medical restrictions, but has been forced to do so by Gillig and Gerardot. Both have indicated that if plaintiff is non compliant that plaintiff will suffer the consequences of same by having her hours and/or duties changed by them. This include discipline for insubordination and/or termination. Plaintiff has been told to Carolyn Dennis by both on several occasions.

(DE # 47 at 14 [all sic].) Plaintiff supports these allegations with her affidavit.

(DE # 47-6 at 6; Dennis Aff. ¶ 18.)

The problem with this evidence, as defendants correctly point out in their

response brief (DE # 49 at 11), is that it directly contradicts plaintiff's previous

deposition testimony. In her deposition, plaintiff very clearly testified that neither Gillig

nor Gerardot ever told her that she was required or needed to work beyond her eight-

hour restriction or threatened to terminate her if she did not work beyond eight hours.

(DE # 45-1 at 88-89; Dennis Dep. 139:23-140:6.) Additionally, plaintiff testified that Gillig

actually told plaintiff that she was required to work within her eight-hour restriction.

(DE # 45-1 at 86; Dennis Dep. 137:12-21.) There was nothing ambiguous or confusing

about plaintiff's deposition testimony – she testified that no one ever threatened her

with termination if she did not work beyond eight hours, and she also testified that

Gillig told plaintiff that she had to work within her medical restrictions.

Due to this inconsistency, plaintiff's assertion in her affidavit cannot be

considered on summary judgment. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063,

1075 (7th Cir. 2012) ("[A] party cannot create an issue of fact by submitting an affidavit

23

whose conclusions contradict prior deposition or other sworn testimony." (citations and quotations omitted)). Plaintiff has failed to direct the court to any evidence that she was forced to work beyond her medical restrictions and therefore cannot show that she suffered an adverse employment action based on her medical restrictions.[9]

### viii. Hostile Work Environment

Finally, plaintiff alleges that she suffered an adverse employment action and was retaliated against when she was subjected to a hostile work environment. (DE # 47 at 20); *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 n.5 (7th Cir. 2004) ("The creation of a hostile work environment can be a form of retaliation."). Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and quotations omitted). "To avoid summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence to create a

---

[9] Additionally, in this section of her response, plaintiff contends that the one-half hour change to her schedule that took place in 2010 was also an adverse employment action. (DE # 45-3 at 8; Gillig Aff. ¶ 17; *see also* DE # 47 at 20.) She specifically argues in her response brief that: "Changing Plaintiff's hours by a half hour to help with the PM audit certification, was an adverse employment action or retaliatory. No one else had their hours changed. These changes were made to accommodate the defendant's 8 hour work schedule not plaintiff's medical restrictions." (DE # 47 at 20.) No reasonable jury could conclude that reasonable person in plaintiff's position would be dissuaded from pursuing a discrimination claim because of a one-half hour change in their work schedule. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("The transfer—which involved no material change in duties or benefits—was not an adverse employment action[.]").

genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [the protected conduct] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Avila v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 12 C 1201, 2015 WL 998321, at *19 (E.D. Wis. Mar. 5, 2015).

In its motion for summary judgment, defendants argue that plaintiff cannot show that her work environment was either subjectively or objectively offensive. (DE # 45 at 21-22.) In response, plaintiff argues that "[t]he hostile work environment that Plaintiff faced daily is a cause of action and a reasonable jury could find that the complained of conduct created a hostile environment especially [sic] since she repeatedly reported it and no one responded to it even today." (DE # 47 at 21.)[10] Plaintiff does not indicate what acts she contends subjected her to a hostile work environment. (*Id.*) The court will therefore assume plaintiff contends that all of the incidents discussed above constitute plaintiff's basis for her hostile work environment claim.

"The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). There is no doubt that plaintiff subjectively believed that her work environment was offensive, so

---

[10] Plaintiff fails to direct the court to any evidence indicating that she reported the allegedly hostile work environment to anyone.

the court will analyze whether plaintiff's work environment was objectively offensive. "In evaluating the objective offensiveness of a plaintiff's work environment, we consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and whether it unreasonably interferes with an employee's work performance." *Racicot v. Wal Mart Stores, Inc.*, 414 F.3d 675, 677-78 (7th Cir. 2005).

Plaintiff contends the following conduct amounted to a hostile work environment: plaintiff was given an investigative interview as a result of the clock ring incident; plaintiff had to have her pay adjusted several times because she was not paid accurately; plaintiff's requests for leave were not approved in a timely manner, although she did not miss any doctor's appointments; plaintiff was forced to make one phone call to her doctor in order to get an update on her medical restrictions; plaintiff's performance rating was reduced one level; Gillig called plaintiff three times with work-related questions while plaintiff was out sick one day; and plaintiff had her work hours changed by one-half hour.[11] These facts are insufficient to raise an issue of fact on plaintiff's hostile work environment retaliation claim. There is no evidence that any of these incidents involved a physical threat, and the only incidents that would have been humiliating to plaintiff are the investigative interview and having her performance

---

[11] As noted earlier, the court will disregard plaintiff's assertion that she was forced to work beyond her eight-hour medical limitation, as plaintiff very clearly testified that she was not told by anyone that she had to work beyond that restriction and was actually told by Gillig that she was required to work within that restriction.

rating reduced one time. None of these incidents interfered with plaintiff's ability to do her job, however; plaintiff very clearly testified in her deposition that she felt that during the time in which she claims she was subjected to a hostile work environment, she still performed at a level that entitled her to receive the highest performance rating available. (DE # 45-1 at 68-69.)

In sum, no reasonable jury could conclude that plaintiff was subjected to a hostile work environment, and no reasonable jury could conclude that the conditions of plaintiff's employment would dissuade a reasonable person in plaintiff's from pursuing a discrimination claim. Because plaintiff has not shown she suffered an adverse employment action, by specific incidents or by a hostile work environment, defendants are entitled to summary judgment on plaintiff's Title VII retaliation claim.

### B. FMLA

Plaintiff also alleges that defendants are liable for violating the FMLA. (DE # 47 at 22.) "The FMLA makes available to eligible employees up to twelve weeks of leave during any twelve-month period for . . . the inability of the employee himself to perform the functions of his position because of a serious health condition." *Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 919 (7th Cir. 2006). "At the conclusion of a qualified-leave period, the employee is entitled to return to his former position of employment, or to an equivalent one, with the same terms and benefits." *Id.* "To protect these rights, the FMLA declares it 'unlawful for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided.'" *Id.* (quoting 29 U.S.C. § 2615(a)(1)).

"To prevail on an FMLA interference claim, an employee must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her the right to FMLA benefits." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012). Defendants argue that they are entitled to summary judgment on plaintiff's FMLA claim because plaintiff has provided "no evidence . . . other than her self-serving testimony that she was entitled to FMLA relief" in support of her claim. (DE # 45 at 24-25.) In her affidavit, however, plaintiff asserts that Gillig was aware that plaintiff was entitled to and intended to take FMLA leave, but that Gillig never approved any of plaintiff's requests for leave as FMLA leave, and therefore plaintiff was damaged by having to use other forms of leave.[12] (DE # 47-6 at 4-5; Dennis Aff. ¶ 14.) Therefore, plaintiff has raised a question of fact on her FMLA interference claim, and defendants' motion for summary judgment will be denied as to that claim.

## V.     Conclusion

For the foregoing reasons, defendants' motion for summary judgment (DE # 44) is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted as it

---

[12] This testimony is undoubtedly self-serving, but that does not mean the court may disregard it. *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 n.1 (7th Cir. 2014).

relates to plaintiff's Title VII retaliation claim, and denied as it relates to plaintiff's FMLA claim.

Pursuant to 28 U.S.C. § 636(b)(1)(A), FED. R. CIV. P. 72(a), and LOCAL RULE 72-1(b), the court hereby **ORDERS** that this case be assigned to Magistrate Judge Susan L. Collins for purposes of holding a settlement conference. A settlement conference has been scheduled before Magistrate Judge Collins, at the Fort Wayne Division of the Northern District of Indiana, on August 13, 2015 at 9 a.m.. The parties are ordered to appear before the undersigned district court judge at the Hammond Division of the Northern District of Indiana on November 6, 2015 at 9 a.m., for a final pretrial conference. Finally, the parties are ordered to appear before the undersigned district court judge at the Hammond Division of the Northern District of Indiana on November 30, 2015 at 8:30 a.m., for trial in this matter. The undersigned maintains a trailing calendar for civil trials. In the event that another civil trial takes precedence on the assigned trial date, this case will proceed to trial on the next available date in order of precedence on the trailing calendar. Absent _exceptional_ circumstances, _**no continuances**_ will be granted for the aforementioned dates.

**SO ORDERED.**

Date: July 20, 2015

 s/James T. Moody             
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT